# Commissioners of the Sinking Fund *v.* Walker *et al.*

6h 143
81   24

The Commissioners of the Sinking Fund of the State of Mississippi can maintain suits for the recovery of loans made by them in that capacity.

It is necessary that they should aver that they are Commissioners of the Sinking Fund, and also that they are incumbents of the office by which they are entitled by law to act as commissioners of that fund.

The legislature may appoint trustees, and convey in trust.

It is a general rule, that all persons capable of confidence, or of holding real or personal property, may hold as trustees.

The charter of the Planters' Bank created the Commissioners of the Sinking Fund trustees of the fund, and authorized them to loan the same at interest.

The trustee is regarded as the legal owner, and may sue at law on any contract made within the scope of his legitimate powers.

IN ERROR from the circuit court of the county of Adams.

This suit was instituted by Augustus B. Saunders, auditor of public accounts of the State of Mississippi, John P. Walworth, president of the Planters' Bank of the State of Mississippi, and Henry D. Mandeville, cashier of the same, as Commissioners of the Sinking Fund of the State of Mississippi, against the defendants, on a promissory note in these words:

"$5,504.                     Natchez, 30th November, 1836.

"Twelve months after date I promise to pay to the order of E. Garnett Howell, five thousand five hundred and four dollars, value received, payable and negotiable at the Planters' Bank at Natchez, with ten per cent. interest per annum, from date until paid, it being for a *bona fide* loan of money from the Sinking Fund of the State of Mississippi."

Signed R. J. Walker, by Wm. Harris, attorney, and indorsed by the other defendants.

The defendants interposed three pleas: non-assumpsit, *nul tiel* corporation, and a tender in state warrants. The plaintiffs then moved the court to strike out the two first pleas, as being incom-

patible with the plea of tender, but the defendants asked and obtained leave to withdraw the plea of tender, and thereupon the court overruled the plaintiffs' motion, and this is assigned for error. The parties then went to trial, and the note being offered in evidence by the plaintiffs, was, on motion of defendants, rejected, and not permitted to go to the jury. This is also assigned as error. The jury returned a verdict for the defendants, and the court rendered judgment accordingly, from which the plaintiffs have appealed.

Mandeville for plaintiffs in error.

The question before the court is, whether the plaintiffs can recover upon the promissory notes described in their declarations.

The points involved in this question are—

First. Had the plaintiffs, as commissioners of the fund, the power to loan from the fund the money for which this note was given?

Second. If they had not the power, are they precluded from recovering on the note?

Third. If they are not precluded from recovering on the note, is the action well brought by the plaintiffs, in their individual names as auditor, president and cashier, virtute officii commissioners of the fund?

It is in this last point of view alone that any question can arise as to their corporate capacity; for it is manifest that they are not a corporation proper, and that whatever corporate capacity they have grows out of their powers and duties, but can afford no rule for construing them.

I. The first point is one wholly of construction; and the ordinary rules for construing legislative acts must be applied.

1. The fundamental rule of construction is to ascertain the intention of the legislature. All the other rules of construction are merely guides to this object. When the intention of the legislature is ascertained, the object is attained, and the question settled.

The first and most certain index to this intention are *the words* in which that intention is expressed. If they are clear, direct, and free from doubt, there is no occasion for further inquiry. Words are to be taken in their ordinary and common acceptation, unless

they have some strictly legal or technical signification. Now what are the words of the act constituting the sinking fund, and the plaintiffs commissioners of the fund, under which they claim the power of taking the security sued on for a loan of money from the fund? "Shall constitute a sinking fund, *under the manage-ment* of, &c., for the redemption of said bonds." The operative word is management. This confers upon them all their powers. Their power is *to manage*, and they have no other. The end or purpose for which they are to manage the fund is the redemption of said bonds, viz: two bonds of the state, each for $125,000, one falling due in 1841 and the other in 1846. Thus the uncontrolled and unrestricted power of management is vested in them; there are no limitations or prohibitions annexed to their management of it; the only limitation is the object to be accomplished, namely, the redemption of the specified bonds. They must manage the fund to effectuate that object. The mode of management—the means of effectuating that object are not prescribed to them; the mode and means are left to their discretion. Every grant of power includes the means necessary and proper to the end. Ang. & Ames on Corp. 145. They must use the means which are necessary and proper in good faith; further than this they are unrestricted. All granted powers must be exercised to effect the purposes for which they were conferred by government. Ang. & Ames, 59. This is the rule as to corporations; and it is applicable in all cases. In the case of the commissioners, the power expressly granted is the power to manage; and in the application of the above principle of law, we say that the commissioners must so manage the fund as to effectuate the object intended by the state, viz: the redemption of certain bonds of the state, falling due at a future known time. Was the loaning of money from the fund, at interest, a legitimate means of providing for that object? The question is not whether it is the *best* means, or an *absolutely necessary* means, without which the end would be entirely unattainable; but was it a proper and legitimate means? Was it a mode of management calculated to effect the end? 4 Wheat. 412. This is the legal construction of the word *necessary;* and if the commissioners were limited to the use of the necessary means, (which they are not,) the court, under the rule of construction, would inquire only if the loaning

13*

of the fund was directly calculated to effect the end for which the fund was constituted. If it was calculated to effect the end proposed by the state, it was within the granted powers, for the commissioners are to manage the fund by all the means proper for the management of the fund; all the legal modes of managing the fund are included in the power to manage. The means must not be foreign to the end; but if they are conducive to the end they are legitimate. The mode of management must be consistent with the prescribed object, and if the act of management be not illegal in itself, nor incompatible with the design, it is within the grant of power, and must be upheld. Was, then, the loaning of the fund a mode or a means (it matters not which) of management calculated to make it meet the obligations of the state to which the fund was appropriated, and for which object it was placed *under the* *management* of the commissioners?

What are the facts. Here a fund of money *in presenti* is to be managed for the liquidation of a debt maturing *in futuro.* Here in 1830 is a fund actually existing, and accruing through a period of ten and fifteen years, which is to be managed for the redemption of bonds of the state, to fall due at those periods of time. Is this money to be locked up as dead capital? Is it to be withheld from the general wealth of the state, and lie wholly useless, unproductive, and liable to loss for ten and fifteen years, when by being loaned out it can be made to increase one hundred and one hundred and fifty per cent. at a simple rate of interest, and to an indefinite extent by recalling the interest at the end of each year, and basing new loans upon it, and thus be rendered in that proportion better able to redeem the bonds when they fall due? Would it not have been better and wiser to let it go into the general treasury of the state, for the actual purposes of government, instead of providing that not even the *surplus* should go there until the payment of the bonds, *as they become due?* The mere statement of the case carries with it conviction. The mere narrative of the facts proves that loaning the money at interest (which the law allows to be ten per cent. per annum) is such a management of the fund, such a selection of the *means* as evinces the exercise of a sound, *bona fide* discretion by the commissioners, and brings their act within the rule, that granted powers must be exercised with direct

reference to the object for which they were conferred.   This view is fully confirmed by the signification of the word management. It has no strictly legal or technical signification or application. The law gives it no other meaning than it has in common usage. The law books, therefore, afford no light in construing or defining it.   We must ascertain its ordinary and common acceptation. Webster defines the verb "to manage" thus, "to conduct; to carry on; to direct the concerns of; to govern or control; to make subservient; to treat with caution or judgment; to carry on concerns or business;" and "management" he defines to be, "conduct, administration, manner of treating, directing, or carrying on." It will only be necessary to substitute for the word management any of these meanings, to see how extensive is the power of the plaintiffs, granted by the legislature.   Thus, "the surplus of such dividends shall constitute a sinking fund, under the management, or under the conduct, or under the administration, or under the manner of treating, directing, or carrying on, of the auditor, and the president and cashier of said bank, for the redemption of said bonds."   Therefore, the commissioners have the *conduct* of said fund for the redemption of the bonds; that is, their action upon it must conduct or lead to such redemption.   Does the loaning of it conduct and lead to that object?   I have shown that it does.

Again, the commissioners have the *administration* of the fund. They must administer it for the payment of the bonds.   Does the loaning of it *administer* to that end?   Clearly it does.

And lastly, the fund is *under the manner of treating, conducting, or carrying on* of the commissioners for the redemption of the bonds.   What more unqualified authority could they, as trustees, have over it?   Is not this an unrestricted discretion as to the *manner* of using the fund for the purpose of redeeming the bonds? We contend, therefore, that in giving the commissioners the management of the sinking fund, the legislature gave them the conduct and administration of it with absolute power and discretion as to the manner of conducting it, directing it, treating it, and carrying it on; so to govern and control it as to make it subservient to the payment of the bonds.   If this does not include the power of loaning it at interest, by which means it will double or triple itself before the bonds become due, there is no meaning in words,

nor truth in the axiom that a whole includes all its parts.   The intention of the legislature is expressed in the ample word *management*.   This court cannot restrict the plain signification of the word, nor the intention of the legislature discovered by the use of it.

The court below took a different view of the subject, and said that the commissioners had no other power over the fund than to keep it, and to pay the bonds with it when they became due, and the reason assigned for this construction of the power to manage was, "that the commissioners might as well use the fund to speculate in negroes as to loan it." The court only varied the illustration, because it has no pretence to be called reasoning, of one of the counsel who argued the cause in the court below, "that the commissioners might as well, when the land fever was raging, have invested the fund in wild lands, because they believed that they might make the fund profitable to the state by so doing." Thus the whole reasoning of the court and counsel below against the power of the commissioners to loan, was based upon the possibility of their using their power to manage in a wild and eccentric manner.   In other words, it is gravely adjudicated that the commissioners have no power, because the legislature has invested them with a wide and discretionary power, which they may pervert and abuse!   Certainly there is something wrong in this mode of ratiocination.   It can not, indeed, be a legal rule of construction, that, because a power is broad, discretionary and confidential, it is therefore no power at all.   There is something novel and startling in the doctrine, and it ought to be carefully examined before it is adopted by the ministers of the law in the sacred temple of justice to defraud the state and her creditors of more than half a million of dollars, by invalidating bona fide contracts, and affixing the sanction of that law which is called the perfection of human reason, and whose seat is said to be "the bosom of God," upon open, wholesale and unblushing dishonesty and fraud.   The force of the argument that the loaning of the money is a regular and profitable mode of managing the fund for the redemption of the bonds, can only be surmounted by an exaggeration happily sown with ridicule, by arguing against the existence of a power from the possibility of its abuse.   This would be well enough to prove that

Commissioners of the Sinking Fund *v*. Walker *et al.*

such a power ought not to have been granted; but the question is not what power *ought* to have been granted, but what power *has* been granted. To reach the conclusion, therefore, that the commissioners had not the power to loan, it is necessary to strip them of all power, and assert that their whole power and duty consists in keeping the fund. The court below has said that the commissioners "could only *keep* the fund; and this was all the legislature intended they should do with it;" and the court derived this intention from the words in which it was expressed. Those words were, that the commissioners should manage the fund for the redemption of the bonds. These words, therefore, mean the same thing as if the legislature had said that they should keep the fund for the redemption of the bonds. To keep a fund of money, and to manage a fund of money, are therefore identical. The words keep and manage are synonymous : custody and management mean one and the same thing. If this be true, what is the use of dictionaries? They are but false lights, maliciously kindled to delude the human mind in its voyages of communication with its kindred intelligence. They tell us that management means conduct, administration, manner of treating, directing and carrying on; and that *to keep* means to hold, to retain in one's power, or possession, not to lose or part with," &c.; and custody they define to be, "a keeping, a guarding, care, watch, inspection for keeping, preservation or security." A jailor *keeps* the prisoners; the sheriff holds the defendant's body in *custody*. Treasure is locked up in a vault for safe keeping; but a steward *manages* a farm—that is, he works it to make it productive. A board of directors has the management of the capital of a bank—that is, they employ it productively. The one is passive; the other is active. The one consists in protecting; the other in using, conducting, carrying on, making subservient to, treating with skill and judgment. The object of the one is security for the identical thing; the object of the other is the active employment of it with reference to a design. The word management excludes the idea of quiescence, inactivity, mere supervision and care. It implies that something is to be done. It comes from *manus*, the hand, and *ago*, to do, or urge, or drive. It implies manipulation, turning from hand to hand, working with the thing. If I give a man my money to keep for me, he must do

nothing with it but guard it from harm. If I give him my money to manage for me, he must work with it, employ it actively, invest it, loan it, do something with it by which a profit will accrue. Every man understands and acts upon the distinction. It obtains in the common transactions of life. The merest drudge in business never confounds the words; and now, for the first time, are they to be confounded and made identicals, not for the purpose of throwing the mantle of the law over an innocent agent, who has been so unfortunate as not to have known his duty from the words in which it was expressed; but for the purpose of throwing ·opprobrium upon honest and disinterested officers of the state, who were so silly as not to know that to manage a fund of money and to keep it were the same thing; and to sanction the better *instructed* dishonesty of those who would take *advantage of the simplicity* of the commissioners to swindle and defraud the state.

If, then, to keep the fund, and to manage the fund, are the same, the question is set at rest. It is very clear that the authority to keep money does not confer the right to loan it. But do they mean the same, and only the same thing? Could the word keeping or custody be substituted for the word management in the tenth section, and confer exactly the same power upon the commissioners? This is the true and only test; and *common sense* and *common usage* must give the answer. If it be true, as has been said by a leading jurist of the day, (13 Pet. 544,) that "the highest legal attainments are never more fully exhibited than in direct appeals to good sense and justice." This view of the subject will forcibly commend itself to this high tribunal—in these cases the last hope of prostrated good sense, and the ultimate resort of stript, lacerated and defrauded justice.

But there are controlling considerations, which prove that it could not have been the intention of the legislature, even *if the* court *could* construe the word management to mean custody, that the commissioners should lock up the fund, and merely have it forthcoming at the maturity of the bonds. The first is, that they used the word management instead of custody. This must be presumed to have been done by design. If they had meant to give the custody only, they would have used the word custody. If they had intended to make the fund so much dead capital, *to*

Commissioners of the Sinking Fund *v.* Walker *et al.*

the detriment of the general wealth, enterprise and productive industry of the country, they would have told the commissioners *not to* manage, but to keep the fund for the redemption of the bonds; as the Independent Treasury law of the United States enacts that the officers specified shall *safely keep* the public moneys; and the word keep is used to prevent any other disposition of them. But the law abhors unproductive capital, as nature is said to abhor a vacuum. Money paid into a court of chancery will be invested by it for the benefit of those who shall be entitled to it. The statute books of England are crowded with enactments against *mortmain* conveyances of property, because the policy of the government is opposed to its property becoming mort, or dead, by going into hands that will withdraw it from the active wealth of the state.

The whole legislation of this state proves it to be her settled policy, to attract and distribute capital within her limits; in order to facilitate and promote the enterprise and industry of her people, and develop her boundless resources; to fell her forests, tame and cultivate her soil, and augment its staple products, more valuable than the mines of Potosi, or the golden "sands of Ormus or of Ind." Whether this policy has not been overdone is not at issue: it is enough that such has been her policy, such was her policy at the time of constituting this fund, which has been more and more developed since that time. The very preamble to the act out of which the sinking fund was established, declares this policy in broad and positive terms.

"Whereas the establishment of a bank in the state of Mississippi, for the purposes of general convenience and public revenue would on the one hand by a judicious increase of the circulating medium give impulse and vigor to agricultural labor, activity to commercial enterprise, and increased value to our lands, and on the other by the creation of revenue relieve the citizens of this state from an oppressive burden of taxes, and enable them to realize the blessings of a correct system of internal improvements." Be it enacted, &c.

Here then the state employs her credit, which is capital, to the extent of two million of dollars in the operations of a bank, which consists mainly of loaning money on interest for the purpose of giving impulse and vigor to agricultural labor, activity to com-

merce, raising the value of her lands, creating revenue, relieving the burden of taxes and promoting internal improvements: and in the same act provides a fund of money to be locked up for ten and fifteen years, utterly withdrawn from aiding in these cherished objects of her maternal care and solicitude! The inconsistency is too glaring to be admitted, unless it comes directly and plainly from her own mouth. But it does not, and it can not be forced upon her by construction; by diverting words from their plain and ordinary signification, and making words synonymous which nobody ever made so before.

There is another incongruity or absurdity which is too obvious to be overlooked, and that is, that she should recklessly and causelessly make a debt on which she was paying six per cent. interest per annum, and at the same time keep a fund by her through a long course of years unproductive, useless to her citizens or herself, instead of spreading the benefit of it around her and at the same time augment it, whether for the purpose of a better provision for her obligations or for the promotion of the generous and inestimable objects for which she incurred the liability, and plighted her sacred faith. Why not create so much less debt, or at least why so long postpone the time of payment after providing a fund which would enable her to pay certain portions of the debt at an earlier day, thus saving to herself an interest of six per cent. annually on such amounts?

The absurdities of this construction do not stop here. It is negatived by the description of persons to whom the management of the fund was committed. What could have been more ridiculous than to select three official persons, one living in Jackson, and the others at Natchez, merely to keep the fund safely when the main object of the act in which the fund is incidentally established and vested in the commissioners was to create a bank in which all the revenues were to be deposited for safe keeping, in which the state was the largest stockholder, and entitled to the appointment of seven out of thirteen directors to watch and protect her interests. It has been judicially determined that the three principal properties or objects of a bank are to issue notes, discount notes, and keep deposits. The first banks were merely banks of deposite. If then the legislature had designed the fund merely to be kept safely, the

Planter's bank would certainly have been chosen for this, as it was for the other funds and revenues of the government, as the most suitable instrument, the safe keeping of deposits being one of the great objects of its creation. If the government could confide to the bank two millions of dollars to be managed for the sake of profit, it could certainly confide to it a surplus merely of those profits accruing from the two millions of dollars; and to which she confided all her other resources, and if she had entrusted them with this sinking fund for safe keeping, she might have reaped some considerable advantage from its being made the basis of banking operations, as is authorized in other cases in sec.        But the idea of appointing commissioners to *keep* the public money for ten and fifteen years, and for no other purpose, through all the probable changes of auditors and presidents and cashiers, can not be entertained with becoming gravity. But the legislature does no such thing. It appoints commissioners: tells them to manage a fund of money for the purpose of redeeming certain bonds at the end of ten and fifteen years: and two out of three of the commissioners chosen, are the active and responsible officers of a bank, the greater part of whose official duties consists in loaning money, selected for their skill in the management of capital, to render it productive. The principle contained in the following extract from Story on Agency, p. 85, is applicable here. He says "an implied authority may be deduced from the nature and circumstances of the particular act done by the principal. If the principal sends his commodities to a place where it is the ordinary business of the person to whom it is confided, to sell, it will be intended that the commodity is sent thither for the purpose of sale. Thus if the owner of a horse should send it to a repository of sale, it would be implied that he sent it thither for the purpose of sale. So if the owner should send goods to an auction room, it would be presumed that he sent them thither for sale. For in each of these cases it could not be supposed that any other purpose could be intended, such as safe custody or mere deposit."

Now had not the legislature a view to the peculiar business and qualifications of the officers, in making them ex officio the managers of their money for a particular purpose? The auditor being a public officer of the state, would especially take care of the

interests of the state; the president and cashier being skilful and habitually employed in the management of money, would invest it more profitably for the state; and the commission of the fund to them would seem to present another case like those cited in Story, where it could not be supposed that any other purpose than the profitable investment of the fund was intended, such as safe custody or mere deposit. The idea that the commissioners were intended to be invested with no other power over the fund than the safe keeping of it, is still further negatived by section 29th of the act of 1830, which enacts, "that all unexpended money in the treasury of this state, and all the money hereafter received by the state on account of taxes, and all other moneys collected for the state by the officers thereof shall be deposited in said bank, to aid and facilitate the operations thereof; subject nevertheless to all drafts on the part of the state, authorized by legal appropriations."

Now here is perfect and uncontradictory evidence of the confidence of the legislature in the bank as a place of safe deposit for all the revenues of the state; and affords an irresistible inference that the legislature did not design merely the safe keeping of the sinking fund, or they would have chosen the bank as the fit and trustworthy instrument for that purpose.— Here all the revenues of the state are directed to be deposited in the bank as well for safe keeping as for the advantage of the bank; but why did not the legislature direct the sinking fund to be deposited there also? the only answer is, that the safe keeping of the fund was not the whole design of the legislature; and that it intended the fund to be managed not for the benefit of the bank, but for the benefit of the fund in the payment of the bonds. This inference is conclusive; and the foregoing section fortifies the argument before urged against the gross impolicy of constituting a fund to be idle ten and fifteen years, when the state is unwilling that its ordinary receipts of revenue should be withdrawn from profitable investment before they were called for by the exigencies of the government. That the legislature should make the bank the depository of all her other resources, and at the same time place the fund in the hands of commissioners for no other purpose presents an incongruity of de-

sign, and a discord of action too gross to be imputed, except in the face of express words, which, in truth, are no where to be found. And besides, here is this favored institution the actual treasury of the state, with the right of loaning to three times the amount of her capital and deposits (including the government money), whose notes are made a legal tender for all dues to the state, which is deprived of the profit derivable for a similar use of this fund; the fund is transferred to commissioners, separated by law a hundred miles apart, who are merely to keep in safety, and thereby debar the bank, the community, the bond holders and the state from all the advantages which would arise from the judicious management of it, by investment in loans or otherwise. And all this without reason or motive. The commissioners could hardly keep it safer than the bank; the six directors of the state could watch and guard it in the bank; they could not in the hands of the commissioners; and it cannot be presumed that the legislature could have more confidence in the safe keeping of the president and cashier of the bank together with the auditor, who are liable to change and succession, than in its own bank upon which it had conferred a legal immortality, and to which it looked as the best depository of the rest of its treasure. It must have been therefore for something that the commissioners could do with the fund better than the bank could that they were chosen to take charge of it, and the legislature has declared what that is, viz. that they could manage it better for the redemption of the bonds. The bank could manage its own capital, and the state and other deposits, most profitably for the bank itself; whilst the commissioners could manage the fund not for the benefit of the bank, but for the benefit of the object for which the fund was constituted. It would hence result that the management contemplated by the legislature was not merely the custody of the fund, but the profitable employment of it; and if that be so, then they clearly have done their duty in loaning it.

Lastly, the construction contended for by the plaintiffs and affirmed by the court below, is completely rebutted by the use of the term management, in another part of the act, by the legislature itself: Section 12, act of 1830, enacts that the seven directors elected by the stockholders, together with the six directors ap-

pointed by the governor as therein provided, "shall have the management and control of the affairs of said corporation."

Sections 16th and 17th give them the power of appointing and removing officers, clerks, &c., allowing them compensation, receiving deposits, discounting bills and notes, making loans on real estate, and doing divers other things: thus expressing some of the things which the legislature intended the directors should do, or have power to do, in the "management of the affairs of the corporation." It is evident therefore that the legislature used the word management in a comprehensive sense, and as a general power including a great number of powers. I do not mean to say that because the legislature committed the management of the Planters' Bank to the directors, and then specified some of their powers, therefore the commissioners of the sinking fund under their power of management would have the same powers expressly granted to the directors of the bank. Powers must be construed with reference to their object. The idea I wish to prove is, that the legislature in the use of the word management meant to convey general and active powers, and not merely a negative and passive duty of safe keeping.

If I am right, then, in assuming that the commissioners have other control over the sinking fund than the mere safe keeping of it, it will be easy to show that the contracts which they seek to enforce are valid, in law, if I have not already done so. Here there is one limit on their power of management, ascertained from the words themselves. They are not merely to keep it safely. Another limit is, that they must manage it for the redemption of the bonds. It hence results that they must *employ it actively* for the redemption of the bonds. Where, I ask, is there any other limitation or restriction of their powers? As trustees they are bound to diligence, fidelity, and the exercise of a sound bona fide judgment and discretion in the active employment of the fund for the redemption of the bonds. Here are their powers and duties, and these are co-extensive. The only question that can arise, therefore, is, have the commissioners in loaning the fund used a sound and bona fide judgment in actively employing the fund for the redemption of the bonds? I think I have already shown that they have. Indeed the first thought that rises to the mind when

Commissioners of the Sinking Fund *v.* Walker *et al.*

the management of a fund of money is presented to it, is the loaning of it.   To manage a fund of money means to make it profitable; and the regular, usual, certain, most known and most practised mode of making money profitable is loaning it.   Like the quality of mercy, it is doubly blessed; it blesseth him that loans and him that borrows.   It yields a profit to the lender, and ministers to the industry, skill, and necessities of him to whom it is lent.   The profit is the interest, and that is certain.   The principal is not liable to fluctuation as in trade or stocks; and the security for the return of the whole is as fixed and certain as the vicissitudes of human affairs will admit; for it is with the owner to demand what security he pleases.   It is not too much to say, therefore, that the legislature contemplated the loaning of the fund; and selected the majority of the commissioners with a wise and discriminating view to their skill and habitual employment in the management of capital to render it at once *safe* and *productive.*

But it is said that even if the power to manage the money would, when standing alone, confer the power of loaning it, yet this power is restrained by the clause in section 10, act 1830, immediately following this grant of the power to manage.   The words of the section are, "the surplus of such dividends, if any there be, shall constitute a sinking fund, under the management of the auditor, and the president and cashier of said bank, for the redemption of said bonds; and that until the full payment and extinguishment of the bonds which shall first become due, amounting to two hundred and fifty thousand dollars, no part of such surplus shall be applied to any other purpose than the extinguishment of the principal and interest of said bonds; and provided, that after the payment and extinguishment of said bonds which shall first become due, and the interest which shall have accrued thereon, amounting as aforesaid to the sum of $250,000, that it shall be lawful for the state to apply such surplus to defraying the necessary and contingent expenses of the government."

It is contended that the proviso, that until the payment of the bonds, no part of the fund shall be applied to any other than that purpose, is a limitation upon the powers of the commissioners to manage the fund for the redemption of those bonds.   Even supposing that this clause was intended to apply to the commissioners,

14*

it would not admit of the construction contended for. It would merely mean that the commissioners were to manage the fund for the redemption of the bonds, and that they should not apply the fund to any other purpose than the extinguishment of the bonds. This is a common form in legislative acts and legal instruments. It first points out the object for which the commissioners are to manage the fund, and then provides that they are not to apply the fund to any other object. The words " such surplus shall not be applied to any other purpose than the extinguishment of the bonds" merely designates the ultimate object of such surplus, and a limitation of its appropriation to that object. It is the same as if the legislature had said to the commissioners, "you are to manage this fund for the redemption of the bonds, but you must not apply the fund to any other purpose." And this last injunction the law would have raised, if it had not been expressed. *Expressum facit cessare tacitum.* And the purpose having been expressed, any other purpose the law would, by construction, exclude. The clause does not say or mean that the commissioners shall do nothing with it but apply it to the extinguishment of the bonds; it does not even say or mean that they shall not use or employ it for any other purpose; it merely says that they shall not apply it to any other *purpose.* The purpose is specified, and the application to that purpose is required. First, the commissioners must manage the fund; second, they must manage it for the redemption of the bonds; third, they must apply the fund to that purpose, viz: the redemption of the bonds, and to none other. These duties do not conflict; the loaning of the fund *in presenti* does not conflict with the application of the fund to the extinguishment of the bonds *in futuro.* The loaning of the fund is an use, but not an application of the fund. The one is a means or mode—the other is a purpose or end. If the means are proper for the end, they are consistent and valid; and that they are such I have already shown.

But it is apparent that this proviso was not intended to apply to the commissioners, but to future legislation. This results from the whole object and construction of the fund. The state issued her bonds for the sake of making a profitable investment of the proceeds, and giving encouragement to the great objects of her policy. With a wise foresight she sets aside a portion of these

Commissioners of the Sinking Fund *v.* Walker *et al.*

profits, and makes a trust fund of it, to be managed as a provision against the payment of these bonds as they become due. The fund she wishes to hold sacred to that object, and she therefore proclaims by a public law that the fund shall not be applied to any other purpose, and prohibits any future legislation which shall appropriate it to any other object; and having thus provided against any other application of it than to that object, in the next clause she provides, that after that object has been accomplished by the fund, and not before then, shall any surplus be applied by the state to the ordinary and contingent expenses of the government. It is thus plain that the proviso has no application to the commissioners, but to the state herself, and prohibits her from diverting the fund from the object of its trust, even for the necessary expenses of the government, until the trust is fully discharged.

I have thus endeavored to show the intention of the legislature, as to the power conferred upon the commissioners, manifested in the words in which that intention is expressed. That intention is the whole object of our investigations, and I might rest my case here.

But we have other lights to guide us to that intention. "Contemporaneous usage has always been considered of great importance in the construction of charters; not that usage can overturn the clear words of a charter, but if they are doubtful, the usage under the charter will tend to explain the meaning of them." 2 Sel. N. P. 333; 4 T. R. 821; Cowp. R. 250.

"Usage cannot alter the law, but it is evidence of the construction given to it, and must be considered binding upon past transactions." U. S. *v.* McDaniel, 7 Pet. R.

"Usage is a good interpreter of laws." 1 Thomas' Coke, 15.

In Stewart *v.* Laird, 1 Cranch 299, which came up on error from the circuit court of Virginia to the supreme court of the U. States, the court say: "Another ground for reversal is, that the judges of the supreme court have no right to sit as circuit judges, not being appointed as such; or, in other words, that they ought to have distinct commissions for that purpose. To this objection, which is of recent date, it is sufficient to observe, that practice and acquiescence under it for a period of several years, commencing with the organization of the judicial system, affords an irresistible

answer, and has indeed fixed the construction. It is a contemporary interpretation of the most forcible nature. This practical exposition is too strong and obstinate to be shaken or controlled. Of course the question is at rest, and ought not now to be disturbed." Page 309, 10. See also 2 Stark. Ev. 562, et seq.

.An examination of the facts of this case will show how strong is the binding authority of contemporaneous and continued practice, as affording a rule of construction, when it goes to the extent of conferring upon appellate judges original jurisdiction as circuit judges, for which no express authority could be found, and apparently in violation of the constitution.

I propose to show by the public records of the state, contemporaneous, continued, and uninterrupted usage and practice to establish the construction of the power to manage contended for by the appellants, that the commissioners have been *loaning* this fund ever since the first dollar came into their hands; that they have been sueing on the notes given, and recovering on them in the courts of the state, and that their power to do so has never before been questioned. As this proof is embraced in that which will be offered under the next position, I will postpone the consideration of it for the present, having merely announced the principle, that such usage, if established, is of binding effect in the case of a doubtful construction of powers.

We are in search of the intention of the legislature; and in the next place I contend that legislative recognition affords a safe and conclusive guide to legislative intention. This would be true even if the commissioners had merely legislative recognition or implied sanction to rely upon in support of their power to loan the fund. But I can establish beyond dispute that such loaning has been directly, repeatedly and expressly sanctioned and ratified by the legislature, both before and since the date of the contracts now in litigation before the court.

The sinking fund was constituted in 1830, in the act chartering the Planter's bank. In 1832 the bank made two semi-annual dividends, the surplus of which after paying interest on certain bonds, was paid over to the commissioners of the sinking fund and became the first portion of that fund. This amount was loaned out by the commissioners at ten per cent. per annum interest: and

the fact was reported to the legislature by the auditor of the state, who was also one of the commissioners of the fund.  In his report of the 15th January, 1833, he says "after paying all the interest due on the state bonds, seventeen thousand forty-four dollars and forty-four cents have been placed to the credit of the sinking fund, and loaned out by the commissioners for twelve months, at ten per cent. interest.  Assuming that the future dividends of the bank will equal the average amount of the past, that fund, *managed as it now is*, will amount to one hundred and fifty thousand dollars, in the year 1841, when the first payment of the state bonds will become due; a sum sufficient to meet this payment, and have a surplus of twenty-five thousand dollars to assist in defraying the necessary and contingent expenses of the government." He then goes on to show the necessity of and the advantages arising from, the state subscribing for the remaining million and a half of stock reserved for her in the charter of the Planter's bank, and observes "I have already shown that the sinking fund will pay the loan already negotiated by the state, with a handsome addition to her revenue.  I will now proceed to show that the contemplated increase of capital will be more beneficial to the revenue of the state with the same careful management.  The state of Indiana has recently sold her state bonds, similar to ours, at a premium of fifteen per cent.: no doubt is entertained that this state can obtain at least an equally advantageous loan.  Should the legislature deem it best to borrow the remaining amount of one million five hundred thousand dollars for the investment of stock authorised by the charter of the bank, and the constitution of the state, the premium on this sum would amount to two hundred and twenty-five thousand dollars, a sum sufficient to defray the expenses of the state for more than three years, without any taxation. Should they think proper to confide it to the management of the commissioners of the sinking fund, it will amount to four hundred and eighty-five thousand seven hundred and fifty eight dollars and nine cents, in ten years, at eight per cent. interest.  But if the legislature should borrow one million three hundred thousand dollars, the premium on this amount would be one hundred and ninety-five thousand dollars, which added to the amount borrowed would make the sum of one million four hundred and ninety-five

thousand dollars. The whole of this sum could be vested in stock, and semi-annual dividends accruing from the amount of the premium placed to the credit of the sinking fund, under the control of the commissioners. The dividends so declared could be loaned at an interest of ten per cent. and thus loaned would amount to five hundred and five thousand seven hundred and seventy-four dollars in ten years, supposing the loans to be made annually, and a much larger sum were the dividends loaned immediately after they were declared, which would frequently be the case. Thus after the expiration of ten years the simple interest upon the nett profits of the bank would nearly defray the expenses of the government: and at the same time afford a speedy relief to the pecuniary wants of the community; objects too desirable for arguments to give them additional claims to your consideration." See Journal of the House for 1838, pages 55, 56, 57, at large.

Here then is the fact reported by its proper officer to the legislature that the first management of the fund was to loan it at ten per cent. per annum interest; accompanied with a calculation of what the fund would yield at the end of ten years under such management; and a recommendation for the further increase of the fund to be managed by the same persons in the same way for the purposes of public revenue, and relief to the community. This report is made on the 15th day of January. On the 30th day of the same month the house of representatives, and on the 4th day of February the senate pass an act amending the original charter of the Planter's bank, which is signed on the same day by the governor; which (sec. 11) authorizes the sale of the state bonds to the amount of a million and a half of dollars to be invested (sec. 12) in the stock of that bank and then enacts (sec. 13,) "That if there shall be any surplus of the proceeds of said loan or loans, after paying the said subscription for stock and the expenses of negotiating the same, said surplus shall be paid over to the commissioners of the sinking fund, and become a part thereof:" thus adopting and enacting the whole recommendations of the auditor's report, both as to the amount to be borrowed and invested, and the commission of the premium to the management of those already entrusted with the sinking fund; and that with full and official knowledge that that management had been to loan the fund; in

the face of the auditor's recommending that it should be loaned. So far did the legislature adopt the views of the auditor as to call them "the commissioners of the sinking fund," after he had so called them, although they are not so called or referred to in any previous act. Here is at once contemporaneous usage, contemporaneous exposition, and immediate ratification; which leave the legislative intent beyond question; and afford safe and conclusive guides for the decision of the court. The case of Williams *v.* the Bank of Michigan, 7 Wend. 548, is directly in point and decisive of this last ground.

That was an action upon a promissory note made by Williams and payable to the president, directors and company of the Bank of Michigan. The main question in this case was whether the governor and judges of the territory of Michigan had power to incorporate the bank. The members of the high court of Errors of New York differed in opinion on the subject, the chancellor plainly intimating the opinion that they had not, but this court unanimously affirmed the decision of the supreme court of New York, on the ground that even if the governor and judges had not the power of granting charters, yet the congress of the United States having for fourteen years let it pass unrepealed: that such silence amounted to legislative sanction, which was binding upon the court.

"Notwithstanding," says the Chancellor, "these serious objections to the validity of this act of incorporation, we can not shut our eyes upon the fact that it has been in operation within the territory nearly fourteen years, without having been annulled or disapproved of by congress; although they had abrogated an act incorporating the Bank of Detroit, adopted at a much earlier period of the territorial government." p. 544.

Again: Mr. Senator Allen—"That the law incorporating the bank was perfectly valid, may be inferred from the fact that it has not been disapproved of by congress, or repealed by the legislative council of the territory"—(after the first territorial government was changed;) on the contrary, it appears that in 1825, eight years after the chartering of the bank, the governor and council gave a sanction to the validity of the act by appointing the cashier of the

institution their agent for the receipt of the contingent fund appro-
priated by congress for the use of the territory, &c.; all of which
shows to my mind conclusively that the legality of the corporation
was undisputed." p. 548-9.

In the case of the commissioners, the legislature, after full know-
ledge that they had loaned the fund, entrusted a still larger amount
to their management.

Again: Mr. Senator Beardsley—"The bank has been in opera-
tion several years; and has been permitted by congress to go on
without interruption. This affords satisfactory evidence that the
government of the United States does not disapprove of the char-
ter, much less that it denies the authority of the governor and
judges to pass such a law. Besides, the case shows that since the
second grade of territorial government has been in existence in the
territory, the law in question has been recognized by the governor
and legislative council." pp. 450, 451,

Now, it is clear that if the silence of congress can be construed
as conferring or sanctioning a high and doubtful power—in other
words, if legislative silence can confer validity on a doubtful or
void charter of incorporations, express legislative recognition must
be decisive in the construction of a power granted by the legisla-
ture itself.

But the commissioners have received express legislative affirma-
tion and ratification of their power to loan the fund; or, rather, of
their *management* of it, which has been not only to loan it in the
manner set out in the appellants' declaration, but to sue and reco-
ver upon the contracts of loan.

In 1839, the committee of the house of representatives, appoint-
ed to report, among other things, "the exact situation of the funds
of the state," reported, on the 1st day of February, 1839, the whole
situation and management of this fund. See Jour. H. R. 1839, p.
202 et seq. They say: "This is loaned by the commissioners of
the sinking fund, composed of the president, &c. to individuals and
firms, on notes having twelve months to run, bearing ten per cent.
interest per annum." On page 265 they state the amount in attor-
ney's hands for collection; and on same page say, "From a curso-
ry survey of this list [the notes,] the committee are of opinion that

prompt and energetic measures should be at once adopted, if they have not already been, for the collection of these notes, or for their renewal, with additional security."

On page 312 of the journal, we find this entry: "The house met, &c. and took up the special order for this hour, viz: 'a resolution relative to the duties of the commissioners of the sinking fund in relation to said fund, proposing to lend the same upon mortgage security, for one, two and three years.' The resolution having been read the third time, the question was stated, 'Shall this resolution pass?' and the vote was taken thereon and determined in the negative—ayes 8, noes 50."

This was on the 5th of February. On the 15th of February, the act transferring the stock of the state in the Planters' Bank to the Mississippi Railroad Company, was approved and became a law, the third section of which enacts—

" That the sinking fund *now under the control* of the auditor of public accounts, and the president and cashier of the Planter's Bank, *shall be managed by them as heretofore,* until otherwise directed by law; *and shall be applied* to the discharge of said bonds which shall first become due, amounting to the sum of two hundred and fifty thousand dollars; and the remainder, after discharging said bonds, shall be collected and paid into the state treasury." Laws Miss. 1839, p. 62.

Here again the legislature, with a full knowledge of what the management of the commissioners had been from the first existence of the fund in 1832, through a period of seven years—with the knowledge particularly brought home to them by the report of their own committee—refused to pass a law directing the fund to be differently managed from what it had been; and in the same breath ratify the existing management and command the continuance of it, until otherwise directed by law. They enact that it shall be managed as heretofore and applied to the discharge of the bonds; thus giving themselves the construction of section 10, act of 1830, which I have contended for; and at all events reconciling the loaning of the fund with the application of it to the payment of the specified bonds. They command also the *collection* of the fund; they recognize the fund as under the *control* of the com-

missioners; thus necessarily giving them the right to sue for it, if that should be required for the purpose of collecting it.

The next section of this transfer act, (section 4,) proves that the legislature is perfectly satisfied with the language used in defining the duties of the commissioners, by constituting another fund for a similar purpose in precisely the same terms.    That section is as follows:

"And be it further enacted, That the Mississippi Railroad Company shall pay all interest which shall hereafter become due upon the aforesaid bonds of the state, and shall deduct the same from the first dividends or profits which may accrue upon the stock of the state; and the surplus of such dividends if any there be, shall constitute a sinking fund under the management of the president and directors of said company, or such other persons as the legislature shall hereafter appoint, for the purpose of being applied to the redemption of said bonds as they shall severally fall due, in the same manner and under the same regulations as are provided in the act to establish a Planters' Bank, approved February 10th, 1830."

The Journals of the House for 1840 prove that the subject was again acted upon; that the whole condition and management of the fund was reported, the amount loaned, the amount in suit for collection; and referred to a committee to report upon when the fund could be made available for the payment of the first bonds in 1841; and that the committee reported thereon.   Journal of the House, 1840, p. 867 to 870 and p. 520-1.

This would seem to be conclusive of the power of the commissioners both to loan and to sue.   It reveals the intention of the legislature beyond a doubt; and would seem to leave nothing for the construction of the courts of the state, whose whole object and duty is to ascertain and give effect to the intention of the legislature.

But it is contended that there is no where given an express power to sue; and that the commissioners have no such interest in the fund as to authorize them to sue in their own names or as commissioners upon contracts made respecting the fund.

If the recognitions and ratifications of the legislature do not

extend to them power thus to sue as well as to loan when the fact that they had done both is equally brought to the knowledge of the legislature before the ratification; if the duty imposed upon them of *collecting* the fund does not open to them the courts of justice *for that purpose*, then it becomes necessary to prosecute the investigation.

The efforts of men seeking to discharge themselves from their obligations, in refining the subtle ingenuity of their metaphysics, are as apt to mislead them from the plain and settled principles of the law as from the beaten highway of common honesty and reciprocal justice. I take it to be a well settled principle of morality as also of law, that if a man borrows money of another he is bound to repay it to *him*. I am not *now* speaking of *contemporaneous usage*, but of *abstract* morality and *theoretical* law. This is in reality the whole and only principle involved in these cases; and thus far the adjudications have been against them. The principle therefore has become involved in doubt, and must be reviewed, and settled or overturned. The importance of the interests involved, must be my justification for an elaboration of elementary principles so fixed and familiar as in other cases to afford the groundwork of argument and deduction, but not the subject of argument themselves.

The commissioners are either a corporation or they are not. One of the defendants here, a man deeply read in the law, and a grave and honorable senator representing this state in the great amphyctionic synod of sovereignties, has registered his solemn oath that they are not a corporation. Fortunately, perhaps, for the appellants in this court, the adjudication of their rights does not depend upon the magnitude of the oath, or the dignity of him who makes it. It might lessen the labors and responsibilities of the incumbents of the bench thus to be instructed by the elastic consciences of witnesses upon doubtful and obscure points; but the law of the land is not so indulgent to its ministers; and my clients would prefer resting the decision of their cause upon the enlightened justice of the bench, than the interested affidavits of their debtor. But admitting, for the present, that the commissioners of the sinking fund have no corporate capacity, it is difficult to per-

ceive why they, as payees of a promissory note, should not have the power to sue when neither the execution nor the consideration of the note is impeached. The fundamental principle of this kind of contract is, that "the making of a note is an express engagement to the payee to pay the money therein mentioned according to its tenor." Bay. on Bills, 37; and that "no person except the payee can bring a suit upon a bill or note, in his own name, before the payee has indorsed it." Ib. 332; 3 Pick. 298.

These notes are payable to the commissioners of the sinking fund and their successors in office. The suits are brought in the name of Augustus B. Saunders, auditor of the state of Mississippi, John P. Walworth, president of the Planters' Bank of the state of Mississippi, and Henry D. Mandeville, cashier thereof, who are the commissioners of the sinking fund of the state of Mississippi. If the commissioners are not a corporation, they sue merely as joint payees; they have alleged themselves to be the payees mentioned in the notes, and the defendants have admitted that they are so by pleading the general issue. The setting out of their official capacities, and that they are commissioners, is, therefore, merely *descriptio personarum*, and can in no way affect their right to recover. It follows, in this view, that they stand in the same attitude as if the notes had been payable to them *by name*, with the description they have given of themselves. The principles applicable to this state of case are clear—thus:

"When a note is payable to A, agent of B, a suit should be brought in A's name, not B's." Bayley on Bills, 335; 8 Mass. Rep. 103.

"So of a note payable to A, as administrator." Bay. on Bills, 335; 2 How. 851; 4 Lou. Cond. R. 701.

"So of a note payable to A, 'president of an incorporated company.'" 8 Mass. 103.

So of a note payable to A, president of a commercial company. 8 Cranch, 30. Or secretary or commissioner of an incorporated company. Bay. 335.

"If a note be payable to A B, trustee of a corporation, A B, and not the corporation, is the legal proprietor of the note, and he is the party to bring suit upon it." Binney *v.* Plumbey, 5 Ver. 500.

Commissioners of the Sinking Fund *v.* Walker *et al.*

In this whole class of cases, the official title subjoined is merely a description for the sake of identification of the person.    *    *
*    *    *    *    *    *    *    *    *    *    *    *

[A page or so of MS. has been lost, preceding this, in which the commissioners were considered as *agents*.    H. D. M., Jr.]

Second. The commissioners are not merely the agents of the state, but *trustees*, for the use and benefit of the bondholders. They are invested with the possession of the fund; it is to be "paid over" to them, and under their management to be applied to the redemption of certain bonds of the state as they become due.

"It has been said that a trust exists whenever one person is managing the funds of another." 1 Hilliard's Abr. 201; 4 Dessaus. 477. A trust is "an obligation upon a person, arising out of a confidence reposed in him, to apply property faithfully, and according to such confidence." Stairs Ins. 591.

"A trust is said to be in the nature of a deposition, by which a proprietor transfers to another the property of the subject entrusted, not that it should remain with him, but that it should be applied to certain uses for the behoof of a third party." Ersk. Ins. 454, cited in Willis on Trustees, 1, 2, 3, (8 Law Lib.)

"Three things are said to be indispensable to constitute a valid trust; first, sufficient words to raise it; secondly, a definite subject; and thirdly, a certain, or ascertained object." 1 Story's Eq. 230, 231, 243, 244.

Here the commissioners are managing the funds of the state: a confidence is reposed in them to apply that fund faithfully according to that confidence; the fund is transferred to them, to be applied to a certain use for the behoof of third parties; there are sufficient words to raise a trust in the fund; the fund is a definite subject for the trust; and the payment of the bonds is a certain and ascertained object for the trust. Whenever the action of a trustee upon a trust fund is spoken of in the authorities, the word management is used.

The term sinking fund itself denotes a trust. It is defined to be "a fund appropriated by a government to the purchase or extinguishment of its own debts;" 11 Encyc. Am. 421. It is similar to the familiar case of an assignment by a debtor to a third person

15*

for the benefit of one or more creditors. The commissioners have the possession and management of the fund, through a confidence reposed in them, to discharge a trust to which it is subjected. They are therefore trustees, and belong to "that numerous class of cases, in which a leading object of the party who created the trust, was to vest the legal estate permanently in the trustee and his successors;" 1 Hilliard's Abr. 230. Speaking of cases where the statute of uses, 27 Hen. 8, ch. 10, does not apply, Story says "Thus, for example, it does not apply to trusts or uses created upon terms for years; to trusts of a nature requiring the trustee still to hold the estate, in order to perform the trusts, and generally to trusts created in relation to mere personalty;" Story's Eq. 234; Willis on Trustees, 202; c. 27, 86.

The commissioners being trustees of personal property, two consequences follow; first, that it was their duty to loan the fund; second, that they not only have the right, but *must* sue to recover it, and that upon the contracts of loan themselves.

First. It was their duty to loan the fund.

"The rule is settled, that executors, and all other trustees, are chargeable with interest if they have made use of the money themselves, or have been negligent, either in not paying the money over, or in not investing it, or loaning it, so as to render it productive." 1 Johns. Ch. R. 509.

"A trustee is bound *to manage* and employ the trust property for the benefit of the *cestui que trust*, with the care and diligence of a provident owner; and so far is this rule extended, that *however fully a discretionary power of management may have been given, yet if the trustee omit doing what would be plainly beneficial, he will be answerable. Trustees are bound to invest trust moneys on good security.* Thus, too, the laws of England, as administered in the courts of equity, invest the trustees with sufficient powers, without any particular declaration of them, *for such management of the trust property as a provident owner would have;* and going still further than the Scotch law, in order that the trusts may be duly executed, will infer a power of sale, although such disposition is not authorised in express terms. In this management of trust estates, whenever trustees have (as is usually the case) the legal fee, in pursuance of that right which

all natural persons, who are capable of entering into contracts respecting it possess, they (as also lay corporations when trustees) are authorised to make leases which may endure as long as their interest in the subject of the lease subsists." Willis on Trustees, 125–6–7–8.

This fully sustains my previous reasoning upon the power conveyed by the word management; proves that loaning is a legal mode of management; that trustees, by virtue of this power, are clothed with the rights of legal ownership, so far as they are consistent with the object of the trust; and completely overthrows any construction that would make "keeping" and "management" synonimous.

Second. As trustees, the commissioners must sue at law, and may sue *upon the contracts*. This results from the fact that the legal title of the fund is in them. 3 Am. Dig. 461; 8 Conn. 286; 1 East. 597; Willis on Trustees, 123, 201; 1 Sand. Uses and Trusts, 341.

"Notwithstanding the party beneficially interested has an estate in equity, equivalent to the legal ownership, yet he cannot sue at law on his equitable title, *but the action must be brought in the name of his trustee.* So fixed and immutable is this principle, that a trustee may maintain an action of ejectment against his own *cestui que trust*, and this is the consequence of trustees possessing the legal estate." Willis on Trust. 201; Ib. 123; 1 Story Equity, 516.

A trust of *personal* property always vests the legal estate in the trustee. Willis, 86, 27.

"So if a note should contain a promise by the maker to pay A, for the use and benefit of B, a certain sum of money, A, and not B, would be the proper person to maintain an action on the note." Story's Agency, p. 404; 8 Mass. 103.

"If a note be payable to A B, trustee of a corporation, A B, and not the corporation, is the legal proprietor of the note, and he is the party to bring suit upon it." Binney *v.* Plumley, 5 Vermont Reports, 500.

And this right and duty of the trustee to sue on the contract is wholly independent of his right to become a party to it. If this be true, the power of the commissioners to maintain these suits

does not depend upon their power to loan; they can recover even though they had not that power, which it would seem difficult to doubt.

Story on Bailments, 114, "But suppose the case of an act, lawful in itself, but not strictly lawful with reference to certain relations between the parties or others, *as if a trustee authorises another person to sell, or to carry away the goods of the cestui que trust,* would a legal contract arise between the trustee and the mandatory? Pothier thinks that in such a case, the mandatory may properly refuse to execute the mandate. But if he does execute it, then it becomes a valid mandate, to the extent of making him liable to account to the trustee. And Pothier distinguishes between those acts which are positively forbidden by the law, or involve moral turpitude, and those acts which the law forbids upon the policy of suppressing fraud. In the common law, the case would turn upon the question, whether it was an actual fraud, meditated by the parties to injure the *cestui que trust,* or only a constructive fraud, consistent with good faith, but inconsistent with the juridical policy which governs in cases of trusts. In the latter case, at least, it might not be deemed utterly void, but only voidable at the election of the *cestui que trust.* If he ratified it there would be no reason to consider it a mere nullity."

In the case of the commissioners, the loaning (if unauthorized) was not an act *malum in se,* or against any known policy of the law. In its broadest wrong, it was a mere constructive fraud, committed in the most perfect good faith. And according to Pothier, the borrowers are bound to account to them, especially as I have shown a full ratification by successive legislatures.

But the authorities are more explicit and conclusive upon this subject than the learned commentator seems to suppose. The principle is thus laid down as settled : that "as between the trustee and cestui, the former does not cease to stand in that relation, by any wrongful act in regard to the estate, except at the election of the latter." 1 Hilliard's Abr. 229. If the trustee does not cease to be so in consequence of any wrongful act with regard to the trust estate, unless the beneficiary elects it, the person contracting with the trustee, of course, cannot avail himself of such wrongful act, when it produces no detriment to him. It being a matter

wholly between the person beneficially interested and the trustee, it is no concern of the party contracting with the trustee, as long as the cestui is satisfied, and does not interfere. Again: purchasers of trust property are in many cases bound to see the application of the purchase money. "In regard to *borrowers*, it is otherwise; for if trustees, having power to lend money on personal security, (which will not authorise an investment on personal security, without an express power to that effect,) afterwards call in money which has been so lent, their receipt alone will be sufficient; *and the person by whom the money was borrowed, cannot object to repay it* on the ground that the trustees, having no express power to discharge the persons to whom they might lend the money, are not entitled to receive it without the concurrence of those beneficially interested." Willis on Trustees, 135; 5 Madd. R. 368.

The case of Mytton *v.* Gilbert, 2 T. R., more fully referred to *post*, is still stronger. It decides that public trustees of a turnpike can maintain an action of ejectment against their own mortgagee, to recover toll houses which they had illegally mortgaged ; and this on the ground of public interest.

It may be said that none of these authorities speak of an action directly upon the contract; but they necessarily imply it, for they proceed upon the principle that the act of the trustee is valid until prohibited by the cestui. If the trustee does not lose his trust character by reason of having transcended his powers, he of course does not cease to be a legal party to the contract; and the only ground for avoiding the contract is, in these cases, that the commissioners could not be parties to them by reason of a wrongful act of loaning. The test of this point is, are the notes absolutely void? If they are not absolutely void, then the commissioners can sue upon them, because they have not lost their fiduciary character by making the loans for which they were given.

The doctrine of all the books is, that if the trustee sells or disposes of the trust property in violation of the trust, the cestui may elect to recover the property, or to affirm the disposition of it, and take the securities into which it has been converted, whether they be promissory notes, or goods, or stock. 1 Story Eq. 503–5–6–7; 2 Johns. Ch. R. 441, et seq.; Willis on Trustees, 185.

Hence the security is not void, but is available to the cestui, if he elects to take it.   But if he acquiesces in the act of the trustee, the trustee having the legal title, of which he has not been divested, must sue upon it at law; for the cestui can have no remedy upon it except by prohibiting the trustee, and calling in the aid of chancery on the ground of fraud.   No such prohibition is pretended in these cases: but, on the contrary, express recognition and ratification have been shown.   Indeed so little shadow of defence have the defendants, that if the public could sustain any loss by reason of the money loaned to them, they would first be liable to satisfy it. "If a trustee err in the management of trust property, yet if he quit with the approbation of the *cestui qui trust*, the breach ought in the first place to be made good out of the estate of the persons who consented to it."   Willis on Trustees, 174, 65, and cases cited.

There is another point not to be overlooked.   By pleading the general issue the defendants admit the plaintiffs' capacity, both as parties to the contract and parties to the suit.   If they had meant to deny it, they were bound to do so on oath.   Not having done so they are precluded from any defence founded on "the parties or the character of the parties suing."   True they have sworn that the plaintiffs are not a corporation: but their being a corporation is not in the least necessary for their maintenance of these suits. They are trustees—they sue as such; and whatever corporate capacity they may have is silently bestowed upon them by operation of law; and affords no subject matter of a plea.

But even if this be not so, the defendants are estopped, by their own act in contracting with the plaintiffs, from denying their right to be parties to the contract (7 Wend.      where the subject is fully considered), unless they can show some stern and crushing policy of the law, prohibiting such contracts, and rendering them *ipso facto* void.   But this they have not done—can not do.   If such a policy existed, it would not run against the state: for the state can make no contract *contra bonos mores*, and of course it would not run against trustees of the state, especially upon contracts sanctioned, and ratified by her.

However, this view of the commissioners as trustees of the state, and of their right to maintain these suits, is only preliminary to what I believe to be their true character.

They are trustees of the public; and *as such* invested with *a corporate capacity, for the purposes of contract and suit.*

They belong to the class of public *quasi* corporations, the existence of which have been recognised by this court, (Carmichael *v.* Trustees of school lands; 3 Howard,        ); and of which the nature and properties are at the present day well ascertained. The essential, inherent qualities of a corporation are those of *succession* and a *corporate name.* Any individual or association of individuals vested by law with these qualities are a corporation; and no corporation can exist without them. All other qualities are *incidents;* but these are *fundamental.*

"A body politic is a body *to take in succession,* framed as to that capacity, by policy," &c.    1 Thomas' Coke, 147.

"A corporation is a franchise possessed by one or more individuals, who subsist as a body politic *under a special name,* and are vested by the policy of the law with the capacity of perpetual succession." 3 Am. Dig. 440; 2 Kent, 266; 4 Wheat. 636, 518, 718; Angell & Ames, 1, 2, 20, 21; 4 Peters, 514; 2 J. ch. R. 325; Civil code of La. Arts. 418, 419, 424-5; 6 Petersd. Ab. 622.

Hence corporations *sole,* although they have few of the general capacities of corporations; Angell & Ames, 19; 1 Kyd, 20; 1 Thomas' Coke, 147, (B.)

The commissioners have this continued existence by succession. It is provided for by the clause "under the management of the auditor, and president and cashier of said bank."

Their succession is thus insured: "It is enough if there be a sufficient description of the grantor or grantee whereby he may be known, as by his name of dignity or office." Com. Dig. Grant. A 2. "A corporation is usually composed of natural persons in their natural capacities; but it may also be composed of persons in their political capacity; of members of other corporations; Angell & Ames, 51, et seq.; 1 Kyd, 32; Com. Dig. Franchises, F 7.

A corporation must also have a name; but that may be implied. Ang. & Ames, 54, 56; Com. Dig. Franchises, F 9.

The commissioners have a name by direct implication; as well as by legislative recognition of them by that name. Law of 1833, 1839 before referred to.

No precise form of words necessary to create a corporation—the words *fundo, erigo, stabilio,* may be wanting; any words are sufficient which indicate an intention. 10 Coke, 40, 6; Angell & Ames, 45, 6; 1 T. R. 575; 7 Mass. 441; 2 J. ch. R. 320, 5.

Here the word used is a word of incorporation: "Shall *constitute* a sinking fund under the management of the auditor, president and cashier." The corporate fund is provided, and the corporators who are to manage the fund: in the same way as a board of directors is provided to manage the capital of the Planters bank.

These principles are laid down, not for the purpose of proving that the commissioners are a corporation, with all the usual powers and qualities of corporations proper; but to show that they have those essential qualities to which the law will attach a corporate character for certain purposes, in order to promote public convenience, and the easy attainment of justice. They belong to the class of *public* corporation which are thus defined by C. J. Holt in the leading case of Philips *v.* Bury, 1 Lord Raym. R. 8; 2 T. R. 346; confirmed by the House of Lords.

"There are two sorts of corporations, the one constituted for public government, the other for private charity. The first being duly created, although there are no words in their creation, for enabling their members to purchase, implead or be impleaded, yet they may do all these things; for they are necessarily included in, and incident to the creation, (10 Co. 30, 6; 1 Ro. Ab. 513 title corp. G. pl. 2;) and these sorts of corporations are not subject to any founder or visitor, or particular statutes, but to the general and common laws of the realm, and by them they have their maintenance and support;" see Terrett *v.* Taylor; 9 Cranch, 43. "Strictly speaking, public corporations are such only as are founded by the government for public purposes, where the whole interest belongs also to the government," &c. Dartmouth College *v.* Woodward; 4 Wheat. 668, 9; 2 Kent's Com. 275; 3 Am. Dig. 441. Where the foundation is public the corporation is public. The sinking fund is clearly of this class. It is founded by the state, upon the funds of the state, for public purposes. The state has vested the legal estate of the fund in the commissioners or trustees, (4 Wheat. 654; 705;) but she is the only beneficial owner.

"In those public corporations there is in reality but one party, and the trustees and governors of the corporation are merely trustees for the public." 2 Kent's Com. 205–6.   See 3 Mass. Rep. 364; 3 Am. Dig. 485; Ang. & Ames, 84–5 et seq.

Of this class of corporations are the political divisions of counties, towns, parishes, &c.   Ang. & Ames.   Also school districts, 13 Mass. Reports, 193, Overseers of the Poor; 15 Johns. Reports, 436, 1840, Supervisors of a County, Loan Officers of a County: and in general, all public officers whose succession are provided for, and to whom public trusts are confided, and on whom public duties are imposed.   From the review of all the authorities a *quasi* corporation may be defined to be one or more persons appointed by legislative act to public office involving trusts, duties, and rights, capable of succession, and for purposes of public convenience, unity of design, perpetuity and concert of action, to prevent the necessity of numerous conveyances, and to give a simple remedy for rights that might otherwise be defeated or delayed, invested with a corporate capacity for the execution of their trusts and the recovery of their rights; but having no corporate seal and where the corporators act directly themselves and not through constituted agents.   Ang. & Ames, 20, 21–2–6–7; 18 J. Rep. 407; 12 Wheat. 75–6.

Hence, whenever the law constitutes trustees for public purposes, it silently invests them with a corporate character *quoad* those purposes.   Upon this principle school districts were decided to be corporations, with a right to sue as such, in Massachusetts. 13 Mass. Rep. 195, Ang. & Ames.

Upon the same principle, "the supervisors of a county" were held to be "a corporation for special purposes and with special powers only," in Jackson *v.* Hartwell, 8 Johns. Rep. 425.

Upon the same principle, "the overseers of the poor," in the case of Overseers of Pittstown *v.* Overseers of Plattsburgh, 18 J. Rep. 418, the court say, "the overseers of the poor are town officers, coeval almost with the settlement of the country.   They are public agents and trustees of the towns, in respect to their poor; and must necessarily, without express authority from the legislature possess a capacity to sue, commensurate with their public trusts and duties.   In Jackson *v.* Hartwell, 8 Johns. Rep. 424, we

recognized the authority of *supervisors of a county,* before the act authorizing them to take grants of land for county purposes, to take such grants. They are *pro tanto* endowed with a corporate capacity. We there said, there are many *instances* in the case of collective bodies of men, coming under one general description, endowed with a corporate capacity in some particulars expressed, but who have in no other respects, the capacities incident to a corporation. We mentioned the examples of a power in church wardens to take goods, and to bring actions of trespass, and referred to M. Kyd for numerous instances of the like kind; 1 Kyd on Corp. 9, 10, 12, 29, 31. *In short, there can be no doubt, that when a public office is instituted by the. legislature, an implied authority is conferred on the officer, to bring all suits, as incident to his office, which the proper and faithful discharge of the duties of his office require."*.

This doctrine has been affirmed and re-affirmed until it has now become settled law. See Todd & McCord, Overseers of the Poor, &c. *v.* Birdsall, 1 Cowen, 260. In the note to this case all the doubts that have ever been expressed on this subject are collected; and they all arise from the supposed difficulty of bringing suits *against* corporate trustees *where there is no corporate fund.* These doubts have been set at rest; and *if they had not been, in* these cases there is a corporate fund to meet all legal demands upon the commissioners and their successors. The case of Jansen, Supervisor of Kingston, *v.* Ostrander and others, 1 Cowen, 671, recognizes the principle above stated to the fullest extent; and discusses the doubts and difficulties before suggested. The case is able and instructive, and merits the attention of the court.

See also North Hempstead *v.* Hempstead, 2 Wend. 109, 132, et seq. The authorities are again reviewed and affirmed in Palmer *v.* Vandenburgh, 3 Wend. 193. The court there decide that overseers of the poor may *make contracts* within the scope of their authority, which are binding upon them in their official capacity, and upon their successors in office, which successors are *liable to be sued* for the non-performance of the contracts of their predecessors.

The case above cited of the inhabitants of the fourth school district, in Rumford *v.* Wood, 13 Mass. Rep. 193, was well consi-

dered, and is a leading case in support of the principle that trustees of the public are a corporation *quoad* the duties of their office.

The commissioners of the sinking fund come within this principle, and within the reason and analogy of all the cases. They are officers provided by legislative enactment; the sinking fund of the state is placed with them in trust; their duty is to manage it; and they are therefore a corporation for the purpose of making all contracts growing out of their duty of management; and of suing upon those contracts. If they acted within the sphere of their duties in making these loans, (and I think I have fully shown that they did,) then they and their successors as a corporation may recover on the notes made payable or endorsed to them for the loans. In this view alone is their power to make these contracts important.

If they had the power, their right to sue as commissioners is clear. At all events they will come within the principle laid down in Story on Bailments, and supported by Pothier, that a legal contract *does* arise between the mandatory and the trustee contracting with him in violation of the trust, Story on Bail. 114, and other authorities before cited; and that the substituted agent is responsible to the original agent for his acts under the substitution, although the original agent had no authority to make such substitution, Story on Agency, 17. Hence it has been decided that if the overseers of the poor make contracts which they were authorized as such to make, they may recover or be sued as a corporation upon them; if they make contracts which they were not authorized as such to make, they are individually responsible. "So long as they contract within the scope of their authority their contracts are valid and obligatory upon them in their official capacity, and upon their successors; but if they transcend their powers, though they may be individually responsible, their successors are not." 3 Wend. 197; 15 Johns. Rep. 281. The contracts are never void. If public trustees exceed their powers they are individually liable; does not reciprocal justice require that they should have the power of enforcing corresponding liabilities against those who contract with them? Suppose the commissioners had borrowed, would they not be personally liable if they had done so without authority; if they had done so by authority would they not be liable as

Commissioners of the Sinking Fund *v.* Walker *et al.*

commissioners? It does not shield a person acting for another from suit to say that he was unauthorized to act for that other; why should such a reason prevent him from suing, unless indeed he had done an act of legal turpitude?

We have thus seen that the commissioners are, for the purpose of discharging their trust, a corporation. We have endeavored to show that their power to manage the fund conferred the power of loaning it; we have shown conclusive sanction and ratification of that power by the legislature; we have shown that their duty as trustees required them to make the fund profitable; have we not shown, therefore, every thing which can be thought necessary to confer upon them the right to recover on the notes which the court below refused to let go to the jury as absolutely *void?* The main part of the argument of counsel for the defendants in the court below was based upon the admission that they were a corporation; that being such their powers must be construed *strictly;* that they had no powers but those expressly granted or incidental to their very existence; and that therefore they had no right to loan. This is beginning at the wrong end. I have shown that *quasi* corporate capacity results, by operation of law, from trusts and duties imposed on public officers by the legislature; these trusts and duties must first be ascertained before corporate capacity attaches; and these must be ascertained by applying the common rules for discovering the legislative intent. The rules, therefore, of construing chartered powers have no application; nor has the doctrine of strict construction ever been mentioned by any court in connexion with quasi corporations. It applies only to corporations proper; where exclusive privileges are granted to a few and which are not to be extended beyond the words of the grant. The inquiry whether the commissioners had the power to loan precedes any question of their corporate character. It is absurd, therefore, to say that because they are a corporation, therefore they have no right to loan. The plain state of the case is, that the commissioners are trustees of the state to manage the fund for a specified object; being trustees with the power of succession, they are for certain purposes considered a corporation, and as such are empowered to use a corporate name, expressly given or implied, in discharging their duty of management; and if this duty requires or

authorizes them to contract or to sue, they may do both in such corporate name.    And the reasons why they may do so are to prevent the necessity of numerous conveyances; to prevent the abatement of suits brought by them through death or otherwise of any of their number; and to maintain a remedy on contracts made with their predecessors, in the actual trustees.    Their powers, rights, and duties are therefore those of trustees, and not of corporations proper; and the rules for the construction of these powers and duties are those which apply to the agents of a public trust, and not those applicable to corporations proper.

But even if the rules for the construction of the powers of private corporations proper were applicable to the commissioners, still these contracts will be enforced in law.    It is said that these contracts are void because they are made with a corporation which had no right to become a party to them; that the corporate power of the commissioners to manage the fund, did not extend to loaning it.    Even admitting it to be doubtful (which I certainly do not) whether they had the power to loan, or, even supposing they had not the power to loan, the adjudged cases go to the full extent that on a suit upon a bona fide contract for which a full consideration has passed, a court will not entertain the question of a misuser or transgression of chartered powers, but will enforce the contracts, and leave the state to exact of the corporation the penalty of its misconduct.    Silver Lake Bank *v.* North, 4 J. Ch. R. 370. Here it was objected that the plaintiffs (a corporation) had taken a mortgage *concurrently* with the loan, whereas their charter only authorized them to take mortgages "for debts previously contracted." The court said, "that if this objection was strictly true in point of fact, I should not be disposed to listen to it.    Perhaps it would be sufficient for this case that the plaintiffs are a duly incorporated body, with authority to contract, and take mortgages and judgments; and if they should pass the exact line of their powers, it would rather belong to the government to exact a forfeiture of their charter, than for this court, in this collateral way, to decide a question of misuser, by setting aside a just and bona fide contract."

In the case of the Banks *v.* Poiteaux, 3 Rand. 136, the court of appeals of Virginia decided that the question whether the banks had exceeded their powers or not, was not fit to be tried in the suit

16*

before them, or at the instance of the party before them ; that if, in purchasing the lands in question, the banks violated their charter, they might for that cause be dissolved, by a proceeding at the suit of the commonwealth, cited in Angell & Ames, 81, 82. Chester Glass Company *v.* Dewey, 17 Mass. Rep. 102. Here a glass company, not empowered to sell goods generally, sold them to one in their service. The court say, "besides, the defendant cannot refuse payment on this ground, but the legislature may enforce the prohibition by causing the charter to be revoked, when they shall determine it has been abused." ·

In Little *v.* O'Brien, 9 Mass. Rep. 423, it was objected to the recovery on a note given for a balance of instalments due from the defendant, as one of the stockholders in an insurance company, that the charter required the capital stock, within six *months* after payment, to be invested in certain designated stocks; whereas, instead of such investment, it appeared that the company received of the several stockholders their respective promissory notes, one of which this was. It was said by the court, that "whether for this misbehavior of the corporation the government might not seize their franchises upon due process, was a question not before them; but it did not lie in the mouth of a stockholder, for this cause, to avoid his contract, which, as between him and the company, was made on sufficient consideration."

"If the corporation be public, in the strict sense, the government have the *sole* right, as trustees of the public interest, to inspect, regulate, control, and direct the corporation, and *its funds* and franchises, because the whole interest and franchises are given for the public use and advantage. They are to be governed according to the laws of the land." 2 Kent, 300–1; Philips *v.* Bury, before cited. In this view the legislative sanctions and ratifications of the management of the fund by the commissioners must be conclusive upon the court. "The case ought to be very strong which would justify any court to depart from the terms of an act; and especially to adopt a restrictive construction, which is subversive of public rights, and justified by no known policy of the legislature." 4 Pet. Rep. 505.

The case of Mytton *v.* Gilbert, 2 T. R. 169, is directly in point, and covers the whole ground of these cases, whether the commis-

sioners had or had not the right to loan the fund. There the trustees of a public turnpike, authorized to mortgage the tolls, mortgaged the toll houses. The mortgage was adjudged to be illegal, because they were not empowered to mortgage the toll houses. Yet an action of ejectment, brought by them to recover the toll houses was sustained, and their mortgage deed was adjudged not to estop them, as it would have done, if they had not been acting for the public. Their right to recover the property was not debarred by their having illegally parted with the possession of it. See also Doe *v.* Booth, 2 B. & P. 219. If the public interest can burst the trammels of an estoppel at law, it must indeed be strong, and that to give an action to trustees who were in the same breath convicted of a breach of their powers. If a trustee can recover property which he has illegally mortgaged, he can certainly recover money which he has illegally loaned. In either case the illegality of the act does not divest him of his trust character, nor of his remedy as trustee. This would seem to be conclusive.

The following appeal was addressed, in a late case, to the supreme court of the United States, by one of the first lawyers of the country:—

"Consider the immorality of urging and aiding the breach of contracts fairly made; especially if on one side executed. Public policy may sometimes require from the tribunals to withhold their aid from parties; but they do it from necessity, and always under the sense of individual injustice and wrong that are done. It is a casual advantage to dishonesty, which ought not to be often presented, nor unless there be a clear prohibition." 13 Peters' Rep. 545. That court thus responded to the appeal:—

"Neither the state nor any of its constituted authorities have interfered in this controversy. The objection is taken by persons who were parties to those contracts, and who participated in the transactions which are now alleged to have been in violation of the laws of the state. It is but justice to all the parties concerned to suppose that these contracts were made in good faith, and that no suspicion was entertained by either of them that these engagements could not be enforced. Money was paid on them by one party, and received by the other. . . . . . . And when a court is called on to declare contracts thus made to be void, upon the

ground that they conflict with the policy of the state, the line of that policy should be very clear and distinct to justify the court in sustaining the defence." ib. 596-7, Bank of Augusta *v.* Earle.

Mr. Chief Justice SHARKEY stated the case, and delivered the opinion of the court.

I shall not stop to inquire into the correctness of the decision on the pleadings, because those questions are wholly immaterial. Both the plea of *nul tiel* corporation and of tender, were bad, because the plaintiffs do not profess to sue as a corporation, and a tender of state warrants was no tender at all.

Much of the argument on both sides has been directed to the question of whether the plaintiffs were or were not a corporate body, but this is also foreign to the purpose, since the plaintiffs have not sued as a corporation, either *quasi* or proper; nor was it necessary that they should so have sued. Their character is that of trustees, and in that capacity I shall endeavor to show that they may maintain the action.

The proof of this proposition involves four questions:—

1. Has the state the power by legislative enactment to appoint trustees?

2. Were the plaintiffs competent to act in that capacity?

3. Was a trust created by the act originating the sinking fund?

4. Can the trustees sue at law on a contract made by them in the discharge of their legitimate functions?

First. That the state by legislative enactment may, either directly or through agents properly appointed, convey in trust and appoint trustees, is a proposition which at this day surely requires neither argument nor authority to support it. It may hold property real and personal, and convey or dispose of it either absolutely or conditionally; or it may direct its application either directly or through agents to any particular object, public or private, either in *presenti* or in *futuro*. Instances are frequent, both in England and America, in which trusts are created by legislative enactment, both for public and private purposes; hence law writers divide trusts into public and private. Trusts so declared may in all respects correspond to those between individuals, and of course the same remedies will apply.

Second. Were the plaintiffs competent to act as trustees in this instance? This position is as free from doubt as the preceding. Before the statute of uses, 27 Hen. VIII. c. 10, there was a limitation or restriction as to those who could stand seized to uses; but since the passage of that statute, trusts have been adopted to supply the place of uses, and the former inability to stand seized to a use, no longer prevails. The general rule now is, that all persons capable of confidence, and of holding real or personal property, may hold as trustees. Corporations may now hold as trustees, although they could not be seized to a use before the statute. Willis on Trustees, 32, 33–8, Law Lib. Two of these trustees are officers of a corporation, and as free from objection as the entire body corporate, and if the corporation was capable of holding as trustee, surely two of its officers may. The trust was not confided to the president and cashier as a part of their official duty, but it was so declared for the purpose of identifying the persons who should execute the trust; and no reason can be perceived why the state might not with equal propriety appoint one of its officers as trustee. To all these officers succession was an incident, and to the persons who should fill them for the time being the execution of the trust was confided, with a view to insure the execution, as it was not likely that any thing more than a temporary vacancy would occur. It was a trust confided to persons who should fill certain offices, not as officers, but as individuals, and as it was contemplated that the offices should be always filled, it was the more certain that the trust would be executed.

Third: Was a trust created by the act which orignated the sinking fund? A trust is said to be "an obligation upon a person arising out of a confidence reposed in him, to apply property faithfully and according to such confidence." Willis on Trustees, 2. To constitute a direct trust, there must be a conveyance or transfer to a person capable of holding it: there must also be an object or fund transferred, and a *cestui que* trust or purpose to which the trust fund is to be applied. No particular words are necessary to constitute a trust; but if it be the plain intention of the parties to create a trust, it will be regarded as such. By the 10th sec. of the act chartering the Planters' bank, provision was made for the creation and management of the sinking fund. The state was

to execute bonds, and sell them, and apply the proceeds to the purchase of stock. It was evidently anticipated that the dividends to be declared to the stockholders would more than suffice to pay the accruing semi-annual interest on the bonds; it was therefore declared that the surplus of the semi-annual dividends, after paying the interest on the bonds, should "constitute a sinking fund under the management of the auditor, and the president and cashier of said bank, for the redemption of said bonds." It was further provided, "that until the payment of the bonds which should first become due, amounting to two hundred and fifty thousand dollars, no part of said surplus should be applied to any other purpose than the extinguishment of the principal of said bonds." By a subsequent act of the legislature, provision was made for the execution and sale of other bonds, the proceeds of which were to be applied to the purchase of an additional amount of stock, and any surplus that might remain after paying for the stock was to be paid over to the commissioners of the sinking fund, and become a part thereof. Here there was a particular fund placed under the management of the plaintiffs, by an act of the legislature, for a particular purpose. It was by them to be managed, not merely kept; and it was so placed upon a confidence that it would be properly managed for the benefit of the state. If it was to be kept only, why not select the vaults of the bank as a safe depository.

It is evident, when we look at the object which the legislature had in view, that the design was to make this fund profitable; hence it was placed under the "management" of the plaintiffs. The power to manage implies the power to control. It allows the exercise of a discretion. It could not be managed without the power to do so, and by requiring the one, the other was conferred. To manage money is to employ or invest it. It requires no other management. The word manage, when applied to money placed in the hands of another, is a word of trust and confidence. The plaintiffs had the legal custody of this fund, and they were required to manage it for the purpose of subserving a particular end; but it was not to be diverted from that end; and under this limitation, it could be managed in no other way than by loaning. The bonds would not become due for many years, and it was policy to make this fund profitable in the mean time. We can not doubt, from

the language employed by the legislature, and the object they had in view, but that it was the intention that this fund should be loaned. There was an obligation on the plaintiffs then, arising out of a confidence reposed in them, to manage and apply the sinking fund faithfully and according to such confidence. There was a legal conveyance of the sinking fund, to persons capable of holding it, for the use and benefit of the state in the extinguishment of a certain debt; hence we conclude that there was a trust created by the act incorporating the Planters' bank, and that the plaintiffs as trustees were acting strictly within their power in loaning the money. It is said to be the duty of a trustee to invest trust money on good security, although no special power be given for that purpose; Willis on Trustees, 126. The power of the trustee is commensurate with the purposes of the trust, and he may always exercise such power as a prudent man would in his own affairs, keeping in view the purposes of the trust: ib. 127; 1 Saunders on Uses and Trusts, 364. That the plaintiffs did not transcend their authority is shown by the acquiescense of the legislature. They were informed by the auditor's report, perhaps more than once, that the sinking fund had been loaned at interest, and the act received at least their implied assent and approbation. Indeed, after they were so informed, a further sum was raised and attached to the sinking fund to be disposed of in the same way.

Fourth: Can the trustees sue at law on a contract made by them in the discharge of their legitimate powers? It is admitted that the plaintiffs are not without a remedy, but it is also said that they have not adopted the appropriate one. Now supposing them to be trustees, and that the defendants have come legally into possession of a part of the trust fund with a knowledge of the trust, this in many cases would make the defendants trustees also; but this rule cannot apply when such possession is acquired in the course of a due and proper execution of the trust; for instance, if a trustee be authorized to sell, the purchaser holds free from the trust. The remedy then must be at law. In the case of Newman *v.* Montgomery, 5 Howard, 742, it was decided by this court, that a trustee could maintain an action of detenue for a slave held in trust, even against his *cestui que* trust. The trustee is regarded as the legal owner, and having the possession of real estate, or the

constructive possession of personal property, he may maintain an action of trespass, and he may sue at law to recover a debt for the use of the party beneficially interested. Indeed, the rule seems to be general, that the remedy at law is with him in all cases concerning the trust property or fund. Willis on Trustees, 206; Saunders on Uses and Trusts, 341, 363. This, it seems from the face of the note, was a contract made with the trustees for a loan of part of the trust fund, and it is surely competent for them to recover it back, and the court below therefore erred in ruling out the note.

The plaintiffs have properly declared as commissioners of the sinking fund, for the plain reason that the trust was not conferred on them by name; it was vested in the individuals who should fill certain offices; it was therefore necessary that they should aver themselves to be the incumbents of these offices, in order to entitle them to the action. This they have done, and it is admitted by the pleading.

The judgment must be reversed, and a venire *de novo* awarded.